16701

BOLEN v. SMITH *ET AL.*
(74 S. E. (2d) 42)

*Messrs. Thurmond, Lybrand & Simons,* of Aiken, *for Appellants,*

*Messrs. Randolph Murdaugh,* of Hampton, and *Thos. M. Boulware,* of Allendale, *for Respondent,*

January 9, 1953.

OXNER, Justice.

This is an action for specific performance of a contract alleged to have been made on November 29, 1950, by Dr. Wiley W. Smith, through an agent, F. L. Harper, to sell to Denzel L. Bolen 96½ acres of land in the Town of Williston, South Carolina, for the sum of $11,000.00. Harper was joined as a party defendant under an allegation that he was jointly responsible with his principal for the consummation of the sale. The wife of Dr. Smith was also made a party defendant in order to adjudicate and provide for her inchoate right of dower. In his answer, Harper admitted making the contract but denied any personal liability, stating that all parties understood that he was acting solely as an agent and his principal was fully disclosed. Dr. and Mrs. Smith denied making any contract for the sale of said land and further pleaded the statute of frauds.

The case was referred to the Master for Barnwell County to take the testimony, upon which it was later heard by the Presiding Judge of the Second Circuit, who filed a decree in which he found that Dr. Smith, through Harper, his duly authorized agent, made the contract set out in the complaint and ordered specific performance. From this decree, Dr. and Mrs. Smith have appealed.

Both Bolen and Harper are residents of Williston, South Carolina. Harper is a lawyer and is also engaged in the insurance and real estate business. For thirteen years and as late as 1947, Bolen rented from Dr. Smith the tract of land involved in this controversy, during which period he sought unsuccessfully to purchase the property. At the time of the making of the alleged contract, Dr. and Mrs. Smith resided in Baltimore, Maryland.

It is not claimed that there was any written contract between Bolen and Dr. Smith. Nor did the latter ever authorize Harper in writing to sell said tract of land. Respondent Bolen contends, and the Court below held, that Harper, under oral authority from Smith, verbally agreed to sell said tract of land to him for $11,000.00, and that the correspondence which subsequently took place between Dr. Smith and Harper was sufficient to satisfy the statute of frauds. The only question which we find it necessary to determine is whether Harper was authorized by Dr. Smith to make the contract alleged in the complaint.

Harper, as a witness for respondent, testified that in October, 1950, Dr. Smith came to his office and stated that he was desirous of selling two farms, one containing 96½ acres and the other 106 acres, for $15,000.00 and would pay the usual commission of 5%. Harper asked him to make a separate price on each tract. According to Harper, Dr. Smith replied that "he wanted for the 96½ acres $11,000.00 and $4,000.00 for the other, would sell either one or both", and further stated that the 96½ acre tract would have to be sold subject to a rental contract which had been made with a Mr. Hare for the year 1951.

On cross-examination Harper testified in part as follows:

"Q. Mr. Harper, when Dr. Smith first came to you about the sale of these two farms he said he wanted $15,000.00 for both of them? A. Yes, sir.

"Q. And did he tell you when you asked him what he would sell either one of them for? A. Yes, sir.

"Q. He told you about $11,000.00 for the 96½ acres and about $4,000.00 for the other? A. No. I interpreted that he would take $11,000.00 for one and $4,000.00 for the other, and would sell either without the other.

"Q. Did Dr. Smith tell you definitely that he would take $11,000.00 for the 96½ acres? A. I understood he would. He said for me to go ahead and sell for that figure.

"Q. Did Dr. Smith authorize selling of one and not both? A. Yes.

\* \* \*

"Q. You look at the letter of November 17th Mr. Harper, did you state in the last sentence of the middle paragraph of that letter of November 17th addressed to Dr. Smith: 'I believe that I understood you to say that you wanted $11,000.00 for one farm and $4,000.00 for the other'? A. That was my understanding.

"Q. Were you positive about it? A. Reasonably positive, yes.

\* \* \*

"Q. Mr. Harper, you had never discussed with Dr. Smith either as to whether a sale should be made for cash or whether a part down payment would be accepted and the balance be paid under mortgage over the property? A. No, sir.

\* \* \*

"Q. I believe you said he did not give you exclusive authority? A. We did not discuss that.

"Q. You had routine authority to sell this land? A. I guess you would call it that.

"Q. You did not have extraordinary authority? A. I do not know what you mean.

"Q. You had nothing other than Dr. Smith listed property with you for sale? A. That's right.

"Q. You, as a Real Estate Agent? A. Yes, sir."

Dr. Smith testified he advised Harper that he was considering selling his property in Williston and requested him "to look around and see if he could get a purchaser and let me know." He further testified:

"Q. Was there any discussion with respect to what you might expect to get for both pieces of property? A. Yes.

"Q. And what did you say? A. I told him $15,000.00.

"Q. Now, as between the two properties was there any discussion what the price for the respective properties would be? A. No, except that I told him I considered one piece of property worth $4,000.00, and the other ought to be worth $11,000.00.

"Q. And the property, with respect to $11,000.00 is the property with 96½ acres, which is the subject-matter of this suit? A. Correct.

"Q. Did you advise Mr. Harper you would definitely accept $11,000.00 for the 96½ acre tract of land? A. No. I would certainly expect him to notify me if he could find a purchaser, and who the purchaser would be."

It appears that Harper thereafter contacted several parties, one of whom was Bolen who first made an offer of $10,000.00, which was transmitted to Dr. Smith by letter dated November 17th. In this letter, after setting out the offer of $10,000.00, Harper stated: "I believe that I understood you to say that you wanted $11,000.00 for one farm and $4,000.00 for the other." Dr. Smith did not reply to this letter. Thereafter Harper tried to get Bolen to raise the offer to $11,000.00. Bolen replied that he would give this amount but wanted to get the place for $10,000.00. This willingness on the part of Bolen to pay $11,000.00 was not communicated to Dr. Smith.

On November 28th it was announced in the papers that the Government was going to locate a large hydrogen bomb

project on the Savannah River. The next morning about 8:30 or 9:00, Bolen contacted Harper and stated that he would give $11,000.00 for the 96 acre tract, either in cash or part cash and a mortgage for the balance, and asked Harper to prepare a deed and forward same to Dr. Smith. Harper requested a binder of $500.00 and Bolen gave a check for this amount payable to Harper as agent. On the same day, November 29, 1950, a deed was forwarded to Dr. Smith for his signature. In the letter of transmittal, Harper stated that Bolen had agreed to pay $11,000.00 for the place, "which you said you wanted", and had given a check for $500.00 as a binder. Dr. Smith was further advised that Bolen would pay either all cash, or part cash and the balance in yearly installments with 5% interest.

On the same day that the above transaction took place, Dr. Smith wrote Harper from Baltimore stating that he was "withdrawing both of my farms for sale", and requesting Harper to forward a bill for "any expense you have incurred about these farms". This letter and the letter of Harper to Smith crossed in the mail and presumably were received by the respective addresses on the day after the letters were written.

On December 4, 1950, Dr. Smith wrote a letter to Harper in which he called attention to his letter of November 28th, inquired whether Harper had received it, and requested the return of Bolen's check. On December 8th, Harper replied that he understood he had authority to sell the property, and that Bolen refused to accept the $500.00 check and indicated he would bring suit to enforce the contract. Harper also requested in this letter the sum of $550.00 as commissions for making the sale.

On December 11th Dr. Smith wrote Harper reiterating his decision not to sell either one of his farms, requesting the return of the check to Bolen, and stating that he would forward check to Harper "for anything that I am owing you." On December 18th Dr. Smith sent Harper check for $550.00.

It is not altogether clear that Dr. Smith ever offered to sell the 96 acre tract for $11,000.00. Harper's testimony that he so "understood" or "interpreted" and was "reasonably positive" to that effect is rather unsatisfactory. There is also considerable uncertainty as to whether Bolen ever agreed to purchase this tract of land for $11,000.00 on the terms upon which Harper says that Dr. Smith listed the property with him. According to Harper, the property was to be sold subject to an existing rental contract for the year 1951 and there is no evidence that this condition was either made known to or accepted by Bolen. But assuming, without deciding, that Dr. Smith had stated to Harper unconditionally that he would take $11,000.00 for the 96 acre tract and that Bolen was willing to purchase at this price, we do not think that Harper was authorized in behalf of Dr. Smith to enter into a binding contract of sale.

"A real-estate broker, under the ordinary contract of employment, has no implied authority to execute a contract of sale in behalf of his principal. Such authority must be expressly conferred upon him or necessarily implied from the terms of the particular contract." 8 Am. Jur., Brokers, Section 61. To the same effect, see 12 C. J. S., Brokers, § 20; Annotation 48 A. L. R. 634. As a general rule, an authority of this kind will not be implied from the mere listing of property with a broker. We held in *Shillinglaw v. Sims,* 86 S. C. 76, 67 S. E. 906, 907, that a contract authorizing a broker to "effect a sale" of real estate only authorizes him to negotiate a sale by bringing the parties together, and does not confer upon the broker the right to execute a contract of sale binding on the principal. In *Edwards v. Coleman,* 139 S. C. 369, 138 S. E. 42, 44, the Court said:

"The owner of land undoubtedly has it within his power to clothe his agent with power to both find a purchaser and to make a complete and binding sale. But the mere employment of an agent to find a purchaser and bring him to the owner, confers upon such agent no authority to bind his

principal beyond his instructions. We think it would be a dangerous doctrine if one merely authorized to find a purchaser for property at a fixed price could, without further negotiations with the owner, enter into a contract for the sale thereof that would be binding upon the owner. A real estate broker is a special agent of limited authority, and is strictly confined to the instructions given him, and a third party dealing with him does so at his own peril."

Where parol authority of a real estate agent to execute a contract of sale is relied upon, the proof thereof must be clear and convincing. *Stengel v. Sergeant,* 74 N. J. Eq. 20, 68 A. 1106; *Spengler v. Sonnenberg,* 88 Ohio St. 192, 102 N. E. 737, 52 L. R. A., N. S., 510; *Degginger v. Martin,* 48 Wash. 1, 92 P. 674. In the last mentioned case, the Court said:

"Although we have thus held that under the statute of frauds an enforceable contract for the sale of real estate may be signed either by the party to be charged or by some other person by him thereunto duly authorized, and that the authority of such other person may be in parol, we are of the opinion that such oral authority should in all cases be sustained by clear and convincing proof, and the manifest preponderance of the evidence, especially where the alleged authority is denied by the vendor or party to be charged. A less strict requirement might tend to promote the particular frauds which the statute was intended to prevent."

Considering the evidence in the light of the foregoing authorities, it falls far short of showing that Harper had any authority to enter into a complete and binding contract to sell. We agree with the frank admission made by him, when cross-examined as to his authority, that he had "nothing other than Dr. Smith listed the property" with him for sale. During the negotiations between the parties, Harper acted as a mere intermediary. He did not purport to be the sole agent of Dr. Smith. If that had been his status, he would have immediately made known to

Dr. Smith the fact that Bolen was willing to pay $11,000.00 at a time when only $10,000.00 was being offered.

In reaching the foregoing conclusion, we have not overlooked the case of *Wharton v. Tolbert,* 84 S. C. 197, 65 S. E. 1056, relied on by respondent, but the authority given the real estate agent there was much broader than that delegated to Harper in the case before us.

Finally, it is argued that the act of Dr. Smith in paying the usual commissions to Harper constitutes an admission of liability to sell and convey in accordance with the contract made by him. We do not think so. These commissions may have been paid by Dr. Smith because he felt a moral obligation to compensate Harper, or he may have thought that there was a legal obligation to do so on the theory that Harper had procured a purchaser who was able, ready and willing to purchase the tract of land at the price asked. But it does not follow from the fact that Dr. Smith may have been liable for compensation to Harper that the latter had authority in behalf of Dr. Smith to enter into a binding contract to convey. See 8 Am. Jur., Brokers, Sections 179 and 184.

We find it unnecessary to pass upon the other issues raised by the exceptions, including the question of the statute of frauds.

The decree appealed from is reversed and the case is remanded for entry of judgment dismissing the action.

BAKER, C. J., STUKES and TAYLOR, JJ., and JAMES B. PRUITT, A. A. J., concur.